## HAMMOND *v.* STATE.

### Opinion delivered April 18, 1927.

1. LARCENY—"SUNDRY DRUGS" DEFINED.—Under an indictment for stealing sundry drugs, the term "drugs" does not refer to any particular drug or medicine, but includes any substance used as a medicine, and the term "sundry" means separate, divers or various.

2. LARCENY—STEALING SUNDRY DRUGS—SUFFICIENCY.—An indictment alleging that defendant stole "sundry drugs," the property of the prosecuting witness, was sufficiently definite for the jury to determine that the property alleged to have been stolen was the same property as that which the testimony tended to show that the defendant stole from the prosecuting witness.

3. INDICTMENT AND INFORMATION—FORMER JEOPARDY.—Under an indictment charging defendant with stealing sundry drugs from the prosecuting witness, a conviction or acquittal thereof would enable the defendant to plead same if he were again charged during the same period with stealing sundry drugs from the same person.

4. INDICTMENT AND INFORMATION—ALLEGATION THAT NATURE OF SUNDRY DRUGS WAS UNKNOWN.—Under an indictment charging defendant with stealing sundry drugs from another without further description, it was not essential to the validity of the indictment to allege that the exact nature of the drugs was unknown to the grand jury.

5. LARCENY—SUFFICIENCY OF EVIDENCE.—In a prosecution for stealing drugs, evidence tending to prove that defendant and another conspired to steal drugs, and that they jointly participated therein, *held* sufficient to sustain a conviction of defendant.

6. LARCENY—PROOF OF CONSPIRACY.—Under an indictment for stealing drugs, though a conspiracy was not alleged, testimony tending to establish a conspiracy between defendant and another to commit the alleged larceny was competent.

7. LARCENY—COMPETENCY OF TESTIMONY.—In a prosecution for stealing drugs, testimony that chemicals handled only by the

wholesale store from which the drugs were alleged to have been stolen were purchased by a retail drug store from defendant was competent as tending to prove that defendant was procuring stolen drugs and .selling them.

8.  CRIMINAL LAW—COMPETENCY OF ACTS OF CONSPIRATOR.—In a prosecution for larceny of drugs admission of testimony that another had pleaded guilty to grand larceny of the same drugs and admission of the indictment charging such other with the crime, was error, as the acts of a fellow conspirator, done after the conspiracy has ended, are inadmissible to show defendant's guilt.

Appeal from Garland Circuit Court; *Earl Witt,* Judge; reversed.

*A. T. Davies, Witt & Witt* and *Murphy & Wood,* for appellant.

*H. W. Applegate,* Attorney General, and *Darden Moose,* Assistant, for appellee.

WOOD, J. Omitting formal parts, the indictment charged that "J. C. Hammond, in the county and State aforesaid, on the................day of....:............., A. D. 1926, sundry drugs, the exact nature and character to the grand jury unknown, of the value of $100, and sundry other drugs, the character and value thereof being to the grand jury unknown, the property of W. S. Sorrells, unlawfully and feloniously did steal, take and carry away, * * * "

The testimony tended to prove that W. S. Sorrells was engaged in the wholesale and retail drug business in Hot Springs, Arkansas. According to his testimony he had lost, during the last three years, as he figured, between $15,000 and $20,000 worth of drugs. The heavy stealing occurred during the last month before Dewey Baldwin quit the employment of witness. Baldwin had been working for witness in witness' drugstore some five or six years, and was witness' head man. The appellant and Baldwin were on very friendly terms. Appellant came by the drugstore nearly every night to take Baldwin home. Baldwin would come down in the afternoon with boxes, perhaps eighteen or thirty boxes, patent medicine boxes, to be filled with drugs to be delivered to various

customers as their orders might come in. On several occasions witness observed that all the boxes were gone next morning. They would be in the store when witness left about 10 p. m. and would all be gone the next morning when witness returned to the drugstore at about 8:30 o'clock. Witness, at first, did not suspect Baldwin, who was the head man in his store, of stealing drugs, but, after witness had been informed by one Braughton that he was buying drugs from the appellant, witness finally came to the conclusion that Baldwin, his clerk, was assisting appellant in getting drugs from witness' store. Witness figured that the appellant wouldn't know how to get out just such drugs as Braughton would want to buy, and witness therefore suspected that Baldwin must be fixing the orders for drugs from witness' store which Braughton was buying from appellant.

Mrs. Sorrells, the wife of W. S. Sorrells, testified to the effect that she was often at the drugstore, and many times would see the appellant there. During the last winter the appellant made the remark two or three times to witness as follows: "Why, I have walked around here and looked at the amount of drugs Mr. Sorrells has here, and one could carry off a load and he wouldn't miss them." Witness replied, "No, I don't suppose he would miss them."

. Witness Ernest Green testified that he worked in the City Drugstore of Hot Springs during the year 1926, and saw appellant delivering drugs to the City Drugstore two or three times. in a Ford sedan. Appellant would usually deliver the drugs about 7 o'clock in the morning. The drugs were in pasteboard boxes. There was nothing on the drugs to indicate where they came from; the invoice was made on small letter tablet paper. The orders totaled about $300, in lots of $75, $80, or $100 apiece. The drugs were the ordinary line of drugs. The orders were delivered publicly. McKinley Lewis was with witness in the City Drugstore at the time. He testified that he was manager of the City Drugstore in Hot Springs, which was owned by Marsh & Braughton. Wit-

ness was acquainted with the appellant, who was an osteopath and had an office in the Arkansas National Bank Building. The appellant delivered drugs to the City Drugstore in September or October, 1925. These deliveries were the ordinary line of drugs for which witness paid the appellant, giving him a check around $90 or $100. Witness got a discount of 30 per cent. on the drugs. Appellant said something about the drugs coming from Little Rock or Pine Bluff, or somewhere, witness didn't remember; something was said about the drugs being applied on a debt that somebody owed appellant. Witness was not positive, but believed that was what the appellant said. Appellant objected to the above testimony, and moved to exclude same. The court overruled the motion, to which ruling appellant duly excepted.

Witness Bush was engaged in the drug and jewelry business at Benton during 1925 and 1926. Appellant came into witness' store with a list of drugs which he wished to sell the witness. Witness bought drugs from appellant once or twice, and received a discount of 20 or 25 per cent. The goods were delivered to witness in regular packages, and were patented articles. The appellant stated that he was helping a friend to dispose of them. This occurred in the fall or winter of 1925. It was during the regular business hours.

The witness Parker testified that he was in the drug business at Benton, Arkansas, and, during the quail season, between December, 1925, and January, 1926, witness bought razor blades, toothbrushes, tooth paste, milk of magnesia and syrup of pepsin two or three times. The appellant said it was a bankrupt stock of goods which came from a store in Little Rock; that he had a few items left which he was selling at a discount of 20 or 25 per cent. Witness paid the appellant by check for the drugs purchased the sum of $115.

Hockens Smyth testified that he lived at Benton, and was in the drug business. Appellant offered witness, on two different occasions, on Sunday, certain goods at a discount of 20 per cent. Witness thinks that appellant

stated that some one had gone into bankruptcy in Little Rock or some place and appellant was getting the goods· from bankrupt stock.

R. A. Moore testified that, the first of the year 1926, the appellant and his mother rented the house diagonally across from where witness lived, on Sorrells Street, and that Dewey Baldwin roomed at the house. While they were there, witness saw Sorrells' delivery wagon, in which were Dr. Hammond and Dewey Baldwin, unload paper and wooden boxes. Witness didn't know what kind of goods these boxes contained. They might have contained household stuff, but witness didn't see any furniture. Appellant was moving into the house, and the truck had Sorrells' Drug Company sign on it, and was loaded with trunks and boxes. Witness thought they were moving in, and had no suspicion that they were storing away stolen goods.

Witness W. O. Green testified that, at the time appellant was arrested, witness asked him what it was all about, and appellant stated that it seemed as though Dewey Baldwin had been accused of stealing drugs and that appellant had delivered some drugs supposed to have been stolen by Dewey Baldwin. Appellant was endeavoring to get witness to sign his bail bond, and appellant did not think he'd have any trouble in proving his innocence.

Witness Hoben testified that he was employed at the Ozark Drugstore in the fall of 1925 and spring of 1926. During that time drugs were delivered at the store, and witness investigated the source whence the drugs came, and ascertained they were delivered to the City Drugstore by the appellant, and in turn were relayed to Ozark Drugstore. Witness noticed that practically all the chemicals in that delivery were made by N. Y. Quinine and Chemical Works, which caused witness to think they came from Sorrells' Drugstore, because the Ozark Drugstore had never received such merchandise from any other wholesale house, as far as witness knew. In the delivery of drugs was a five-pound can of iodide of potassium made by the N. Y. Chemical House, and that brand

was handled exclusively by the Sorrells Drug Company. Witness did not know whether the wholesale company in Little Rock handled the same kind .of drugs, but the Ozark Company never received such merchandise from any drug house except from Sorrells. That was the only reasonable place it could have come from.

W. S. Sorrells was recalled, and testified that he did not know of any other wholesale drug house in Hot Springs that handled the N. Y. Chemical drugs. Witness was acquainted with the class of manufacture of drugs handled by the other wholesale houses in the city. Witness usually bought iodide of potassium put up by the N. Y. Chemical Company in five-pound cans and some in one-pound cans—usually ten or twenty-five pounds at a time in five-pound cans. The appellant had no authority to sell drugs from witness' house.

Several witnesses testified, on the part of the appellant, that appellant was a man whose general reputation for honesty, fair dealing, truth and morality was good in the community where he had formerly lived in the State of Iowa. Also witnesses testified that his general reputation for honesty and fair dealing was good in the city of Hot Springs, where he then lived.

There was other testimony adduced by appellant tending to prove that, when appellant moved into the house on Sorrells Street, the boxes unloaded from the truck contained household.goods and not drugs. One of the witnesses testified for appellant that he represented the Ellis Drug Company, wholesale druggist, of Little Rock, Arkansas, which made sales to various drugstores in Hot Springs of drugs and chemicals manufactured by the N. Y. Chemical Company, in January, 1926.

The court, in its instructions to the jury numbered three and six, in effect told the jury that, if they believed beyond a reasonable doubt that appellant and Dewey Baldwin entered into a conspiracy for the purpose of unlawfully and feloniously taking the drugs of W. S. Sorrells, and, in pursuance of such conspiracy, did steal the drugs of W. S. Sorrells as charged in the indictment,

then the defendant would be guilty, and the jury should so find; and in its instruction numbered four the court, in effect, told the jury that the unexplained possession of property recently stolen is a circumstance which the jury may take into consideration in determining the innocence or guilt of the defendant, and, if the jury found that drugs of the value of more than $10 had been recently stolen from W. S. Sorrells, as charged in the indictment, and that such drugs were found in the possession of the defendant, and that such possession had been unexplained, the jury might consider this as a circumstance to establish the guilt or innocence of the appellant.

The above are substantially the facts upon which the jury returned the verdict finding the defendant guilty and fixing his punishment at imprisonment in the State Penitentiary for a period of two years. Judgment of sentence was pronounced in accordance with the verdict, from which is this appeal.

1. Appellant contends that the indictment was too indefinite and uncertain to identify the property and to inform the defendant of the offense with which he is charged. The term "drug," as defined by the lexicographers, is "any substance used as a medicine, or in the composition of medicine for internal or external use." See Webster and Funk & Wagnall's dictionaries.

Section 6 of the United States Food and Drug Act, June 30, 1906, reads: "The term 'drug,' as used in this act, shall include all medicines and preparations recognized in the United States Pharmacopœia or National Formulary for internal or external use, and any substance or mixture of substances intended to be used for the cure or mitigation or prevention of disease of man or other animals."

The term "sundry" means separate, divers; several, divers; more than one or two, various. See Web. Int. Dict. This term "drug," as defined by lexicographers, does not refer to any particular drug or medi-

cine, and it is a term commonly understood and accepted as above defined.

In *Dunbar* v. *U. S.*, 150 U. S. 185, it is said: "It is not a valid objection to an indictment that the description of the property in respect to which the offense is charged to have been committed is broad enough to include more than one specific article." See also *Commonwealth* v. *Butt*, 124 Mass. 449; *State* v. *Brinn*, 30 Minn. 522, 16 N. W. 406. Our statute only requires that the act or omission charged as the offense be stated with such a degree of certainty as to enable the court to pronounce judgment of conviction according to the right of the case. Section 3013, C. & M. Digest. Any defect which does not tend to the prejudice of the substantial rights of the defendant on the merits is to be disregarded. Sections 3013 and 3014, C. & M. Digest. Our statute only requires a statement of the acts constituting the offense in ordinary and concise language and in such manner as to enable a person of common understanding to know what is intended. Section 3028, C. & M. Digest, subdiv. 2. In *Jones* v. *State*, 64 Fla. 92, 59 So. 892, L. R. A. 1915B, p. 71, it is said: "If a sufficiently certain description cannot be given because unknown, such fact, if alleged in the indictment or information, will generally cure the otherwise insufficiency, for the law is not inclined to require a greater certainty than the nature of the case affords; and consequently, to avoid what would in many cases result in a failure of justice were the rule requiring a definite description enforced, the courts make an exception in case the ordinarily essential descriptive facts cannot be stated because neither known nor obtainable."

In the case at bar it is obvious that it would have been impracticable, if not impossible, for the pleader to have specifically described a sundry lot of drugs of the value of $100. The indictment, we believe, meets every requirement of good pleading. It is sufficiently definite for the jury to have determined that the property alleged to have been stolen was the same property as that which the testimony tended to show the defendant stole from

W. S. Sorrells. *Osborne* v. *State,* 96 Ark. 400, 132 S. W. 210; *Atchinson* v. *State,* 90 Ark. 457, 119 S. W. 651. A conviction or acquittal on this indictment would enable the appellant to successfully interpose the plea of *autrefois convict* or *acquit,* if he were again charged with stealing, during the same period, of "sundry drugs from W. S. Sorrells of the value of $100." It follows also from the above that the court did not err in refusing appellant's prayer for instruction telling the jury that there had been no evidence to show that the exact nature and character of the drugs that had been stolen were unknown to the grand jury, and the jury therefore should find the defendant not guilty. . Since the term "drugs" includes any substance used as medicine, and since there are divers and sundry kinds of medicines, all included within the word *drug,* it was not essential to the validity of the indictment to allege that the exact nature and character of the drugs were unknown to the grand jury. This allegation was immaterial, and should be treated as surplusage.

2. We have set forth in substance the material testimony upon which the verdict was based, and it could serve no useful purpose to comment upon it. We are convinced that the evidence was legally sufficient to sustain the verdict. It tended to prove that the appellant and one Dewey Baldwin were in a conspiracy to steal drugs from W. S. Sorrells and that they jointly took part in the larceny. While the indictment does not charge a conspiracy to commit larceny and does not charge the appellant and Baldwin jointly with the commission of the larceny, nevertheless testimony tending to show that they were conspirators and *particepes criminis* in the commission of the offense was not incompetent. See *Monk* v. *State,* 130 Ark. 358, 197 S. W. 580; *Davidson* v. *State,* 132 Ark. 116, 200 S. W. 137. The court therefore did not err in refusing to grant appellant's prayer for a directed verdict. *Paxton* v. *State,* 114 Ark. 393, 170 S. W. 80, Ann. Cas. 1916A 1239.

3. Bob Hoben testified, in substance, that a bill of drugs was received at the Ozark Drugstore, and that in this bill were chemicals and iodide of potassium put up by the New York Chemical Company; that he had never known of any of this particular brand of chemicals being received at the Ozark Drugstore except from Sorrells. He further testified that the boys at the City Drugstore told him that the defendant had delivered this bill of drugs to the City Drugstore and that this bill of drugs had been relayed from the City Drugstore to the Ozark Drugstore. Witness, as a rule, checked the bills that came into the Ozark Drugstore when they received merchandise from W. S. Sorrells. There were some chemicals in the order that were generally made by the N. Y. Chemical Works, which naturally made witness think they came from Sorrells' Drugstore, because the Ozark Drugstore had never received such merchandise from any other wholesale house, to his knowledge. Witness stated that there was a five-pound can of potash in the order, and that brand of drug was exclusively handled by the Sorrells Drug Company. While the testimony of Hoben was being given, upon objection by the appellant, the court excluded that part of his testimony in which he stated that the boys in the store told him that the defendant had delivered certain drugs. At the conclusion of the taking of the testimony, the counsel for appellant moved to exclude the entire testimony of Hoben. The court, in ruling upon the motion, said: "As to the testimony of Hoben, his testimony will be excluded; there is none of his testimony that would be competent for the jury to consider, except his testimony as to where a certain quantity of the drugs there shipped to the City Drugstore came from, and explained his reasons; it would be for the jury to say whether or not he had sufficient reasons for knowing that those goods came from the Sorrells Drugstore."

There was no prejudicial error to appellant in the court's ruling. The court excluded the hearsay part of Hoben's testimony. That part of his testimony which tended to prove that the Ozark Drugstore received a cer-

tain bill of drugs containing some chemicals and iodide of potassium from Sorrells Drug Company was competent. This testimony, when taken in connection with the testimony of Sorrells, that his drugstore was the only one that handled drugs of that character in Hot Springs, and the testimony of Braughton, who operated the Ozark Drugstore, to the effect that he bought such drugs from the appellant, rendered the testimony of Hoben competent, because this testimony tended to prove that appellant was procuring drugs from the Sorrells Drug Company and selling the same to the City Drugstore. The testimony tended to throw light upon the issues involved, and the court did not err in refusing to exclude it. See *Brown* v. *State,* 161 Ark. 253-255, 255 S. W. 78.

4. Witness Jones testified that he was the deputy circuit clerk, and was waiting on the court the time Baldwin entered a plea of guilty of grand larceny. Counsel for appellant objected to that testimony, stating that the record is the best evidence. Counsel for appellant then asked the witness: "Has that record been written up yet? A. No sir. Q. All you know is that he pleaded guilty to grand larceny, wasn't it? A. That is all." Later Jones was recalled by the State, and, over the objection of appellant, testified that he had copied the indictment and had same in his hands, and stated that the defendant pleaded guilty to the offense charged in the indictment. The district attorney offered the indictment in evidence. The attorney for appellant objected, and the court stated, "This is for the purpose of showing that he entered a plea of guilty to the larceny of property which this defendant is also charged with taking." The court thereupon overruled the objection, and permitted the indictment charging Dewey Baldwin with the crime of grand larceny in the stealing of sundry drugs, etc., the property of Sorrells, to be read to the jury. At the conclusion of the testimony counsel for appellant moved to exclude the testimony of Jones with reference to the indictment and the plea of guilty of Dewey Baldwin, and moved to exclude the indictment in that case from the

jury. The court overruled the motion, saying, "I explained to the jury the only purpose for which the indictment against Dewey Baldwin could be considered was for the purpose of showing that the crime to which he pleaded guilty was the larceny of the drugs from W. S. Sorrells, and told them, at the time, that the indictment against Dewey Baldwin should not be considered as a circumstance against the defendant here."

The court erred in admitting the above testimony. As we have already observed, the appellant was not jointly indicted with Baldwin for the stealing of the drugs of Sorrells, nor was the appellant charged with entering into a conspiracy with Baldwin to steal the drugs of Sorrells. These were separate prosecutions; there was nothing in the indictment against appellant to indicate that he was charged with stealing the same drugs that Baldwin was charged with stealing, and, if there had been, the plea of guilty of Baldwin could not be used as substantive evidence of appellant's guilt. See *Kirby* v. *U. S.,* 174 U. S. 890, 43 L. ed. 47, 19 S. Ct. 574. To be sure, as already stated, any testimony tending to prove that appellant and Baldwin entered into a conspiracy to steal the drugs of Sorrells, or that they jointly committed the offense, would be relevant evidence, because such testimony would tend to prove the guilt of appellant. But, after the conspiracy is ended and the offense committed, the declaration of a co-conspirator or joint actor in crime cannot be used as evidence against a co-conspirator or co-actor. The many cases of our court announcing this rule are collated in *Counts* v. *State,* 120 Ark. 462, 179 S. W. 662, where we said: "It is thoroughly established that, when a deed is done and the criminal enterprise of the conspirators is ended, the acts or declarations of one conspirator are thereafter inadmissible against his co-conspirator." See also *Housley* v. *State,* 143 Ark. 315, 220 S. W. 40; *W. D. Stroud* v. *State,* 167 Ark. 502, 268 S. W. 850.

For the error indicated the judgment is reversed, and the cause is remanded for a new trial.